**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

BENCHMARK CONSTRUCTION
CO., INC., et al.,                                    CASE NO. 3:20 CV 1077

    Plaintiffs,

    v.                                                        JUDGE JAMES R. KNEPP II

CITY OF LIMA, OHIO,

    Defendant.                                      **MEMORANDUM OPINION AND
                                                                    ORDER**

### INTRODUCTION

On May 18, 2020, Plaintiffs MG Underground, LLC ("MGU") and Benchmark Construction Co., Inc. ("Benchmark") filed suit against Defendant the City of Lima, Ohio ("Lima" or "the City"). (Doc. 1). In their complaint, Plaintiffs bring three claims for relief: (1) breach of contract; (2) unjust enrichment; and (3) statutory pre-judgment interest. *Id.* at 6-7. The City asserted Counterclaims against Benchmark for (1) breach of contract, (2) breach of express warranty, (3) breach of implied warranty, (4) negligence, and (5) indemnification. (Doc. 18, at 10-13). The negligence counterclaim was also asserted against MGU. *Id.* at 12. The City further asserted a Third-Party Complaint against Liberty Mutual Insurance Company for breach of contract. *Id.* at 15. Currently pending before the Court are the City's Motions for Summary Judgment (Docs. 43, 45) which are asserted against each Plaintiff, respectively.

For the following reasons, the City of Lima's Motions for Summary Judgment on Benchmark's and MG Underground, LLC's claims (Docs. 43, 45) are granted. Additionally, the Court grants partial summary judgment in favor of the City on its breach of contract

counterclaim against Benchmark (Doc. 45) and denies summary judgment on all other counterclaims.

## BACKGROUND

<u>The Bid</u>

The City sought bids from contractors to complete their construction project known as the "West High and North Jameson Sewer Rehabilitation" project ("Project"). *See* Doc. 44-6, at 53-80. It provided for different methods of sewer rehabilitation including Segmental Slip Lining, Spiral Wound Pipe Renewal – HDPE ("SPR"), and Spiral Wound Pipe Renewal – PVD ("PVC"). *See id.* at 242-76. Benchmark made a bid using the SPR option. *Id.* at 85-87. (Coleman Depo. I, Doc. 44-5, at 29-30).

Article 3 of the bid form, entitled "Bidder's Representations", states:

3.01. In submitting this Bid, Bidder represents that:

A.     Bidder has examined and carefully studied the Bidding Documents, and any data and reference items identified in the Bidding Documents . . . .

B.     Bidder has visited the Site, conducted a thorough, alert visual examination of the Site and adjacent areas, and become familiar with and satisfied itself as to the general, local, and Site conditions that may affect cost, progress, and performance of the Work.

(Doc. 44-6, at 77-78). Benchmark's bid of $3,250,828.00 was accepted and it was awarded the contract in February 2018. *See* Doc. 44-2, at 33-114 (Project Contract). The work was described in the contract as:

The project includes the rehabilitation of 447 lf of 48" diameter, 1,766 lf of 54" diameter and 549 lf of 78" diameter combined sewer using trenchless technology, 2 laterals on North Jameson and 7 laterals on West High to be reinstated to the rehabilitated combined sewer with new cleanouts, and installation of new 1,674 lf of 10" diameter sanitary sewer, including 27 new lateral connections and cleanouts.

<u>Benchmark MG Exhibit C, Page 2 of 26</u>

*Id.* at 33. The same language from the bid form regarding representations of a site visit and examination appears in the Project Contract. *See* Doc. 44-2, at 37 ("Article 8 – Contractor's Representations").

Benchmark then subcontracted with MGU. *See* Doc. 44-6, at 1-12.

SPR Installation Generally

Drew Yandell served as the project foreman for MGU on the project. (Yandell Depo., Doc. 44-9, at 7). He described the process of installing SPR. Yandell recalled that MGU sent Black & Veatch (the engineering firm that oversaw the Project on the City's behalf (Doc. 44-1, at 41-42)) a letter at the outset of the project describing the use of "slip lining". *Id.* at 20. Yandell also described SPR installation process in general terms, stating:

> You set up the spool depending on the temperature outside. It needed to be a certain temperature. . . . It needs to be able to be flexible. . . . You get the machine -- you have got to get the hole opened up. You remove the concrete or whatever the pipe is made out of so the machine sets and will wind that new pipe directly in the middle of that post pipe. Then you get everything set up, get it all in there, get it wired up, ready to go, fired up, heated up. And then you just turn it on and let it go. Successfully, you will get the bead just right. You will make some small adjustments, it will start welding and it just goes. And then as long as flow is good and the pipe floats like it should, it will go right on down as long as the pipe is straight, what not.

*Id.* at 72-73. In this case, installment of SPR began in Fall of 2019, and immediately problems of breaking occurred because the SPR was dirty. *Id.* at 76. Yandell recalls the SPR was damaged on arrival due to improper storage attributed to nonparty Contech. *Id.* at 77. Contech also improperly delivered and transported the SPR which caused bending and ribbing; Contech's apparent shortcomings continued throughout the course of the project. *Id.* at 77-78. SPR is supposed to have a protective film around it while stored, but because of the mis-storage, the SPR had no protective film and became dirty, which contributed to the cracking. *Id.* at 78-79.

SPR was eventually installed from Rosedale to Charles, and also down Jameson to near North Street. *Id*. at 87-88. MGU repeatedly had to ask Contech for replacement SPR due to its defects. *Id.* The piping eventually cracked and failed around the welds as a result. *Id*. at 116. The record suggests this aspect of the project was never completed.

Contract

The Project Contract contained provisions requiring, *inter alia*, Benchmark to supply the tools, labor and material. *See* Doc. 44-2, at 75-76. Both the bid document and contract contain provisions regarding Benchmark's contractual duty to inspect the project site, for example:

> B. Contractor has visited the Site, conducted a thorough, alert visual examination of the Site and adjacent areas, and become familiar with and is satisfied as to the general, local, and Site conditions that may affect cost, progress, and performance of the Work.
> . . .
>
> D. Contractor has carefully studied all: (1) reports of explorations and tests of subsurface conditions at or adjacent to the Site and all drawings of physical conditions relating to existing surface or subsurface structures at the Site that have been identified in the Supplementary Conditions, especially with respect to Technical Data in such reports and drawings, and (2) reports and drawings relating to Hazardous Environmental Conditions, if any, at or adjacent to the Site that have been identified in the Supplementary Conditions, especially with respect to Technical Data in such reports and drawings.
>
> E. Contractor has considered the information known to Contractor itself; information commonly known to contractors doing business in the locality of the Site; information and observations obtained from visits to the Site; the Contract Documents; and the Site-related reports and drawings identified in the Contract Documents, with respect to the effect of such information, observations, and documents on (1) the cost, progress, or performance of the Work; (2) the means, methods, techniques, sequences, and procedures of construction to be employed by Contractor; and (3) safety precautions and programs incident thereto.
>
> F. Based on the information and observations referred to in the preceding paragraph, Contractor agrees that no further examinations, investigations, explorations, tests, studies, or data are necessary for the performance of the Work at the Contract Price, within the Contract Times, and in accordance with the other terms and conditions of the Contract.

4

(Doc. 44-2, at 36-37). The contract included provisions affirming not only that Benchmark performed site inspections and studied all relevant tests and studies, but also that no further examinations or studies of any kind were necessary for Benchmark to complete the work performance at the agreed upon rate and schedule. (Doc. 44-2, at 38).

Change Orders & Work Change Directives

The Standard General Conditions of the contract include provisions for change orders and work change directives. (Docs. 44-2, at 92-96).

In November 2018, the parties signed Change Order No. 1 regarding dye testing, resulting in an increase of the original contract price of $10,400. (Doc. 44-6, at 550). In the same month, the parties executed Change Order No. 2, which addressed various issues causing delays and resulted in the installation of the SPR by April 1, 2019, and a change in the substantial completion date from an original February 11, 2019 to July 19, 2019. *Id.* at 558.

In February 2019, the City issued Work Change Directive No. 1 to address an increased payment for sewer cleaning in the amount of $17,708.00. (Doc. 44-8, at 1). In April 2019, the City issued Work Change Directive No. 2 regarding a request for proposal. *Id.* at 2.

In May 2019, the parties signed Change Order No. 3. (Doc. 44-6, at 566). This addressed the two Work Change Directives, and a stop work order issued by the City to Benchmark in December 2018 due to a collapse of a portion of the sewer. *Id.* It indicated that following the repair of the exiting sewer, the City issued a notice to Benchmark to return to work, and Benchmark returned on April 22, 2019 to proceed. *Id.* The change order again shifted the substantial completion date, this time to October 11, 2019. *Id.*

5

Installation

Once Benchmark began to install the SPR in 2019, it – through subcontractor MGU – ran into difficulty. Yandell testified that "we went in and it went in so many feet and it just broke apart", it did "not want[] to stick" and that is when they "discovered that it was dirty." (Yandell Depo., Doc. 44-9, at 76). The material was "so dirty that it just . . . [wouldn't] stay welded, glued together." *Id.* at 82. However, at some point, SPR was installed from the Rosedale manhole to the Jameson manhole. *Id.* at 88.

There is no dispute that a significant portion of the project remains incomplete. (Doc. 48, at 6). The central issues of this case are whether Benchmark materially breached the contract, and in turn, if the City was permitted to terminate Benchmark under the contract as a result. Benchmark claims it is owed $956,082.25 in unpaid bills (*id.* at 7), while the City claims it is owed $1,215,809.00 to complete the project (Doc. 25, at 14).

### STANDARD OF REVIEW

Summary judgment is appropriate when the evidence shows there is "no genuine dispute as to material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must consider all underlying facts "in the light most favorable to the party opposing the motion." *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 457 U.S. 574, 587 (1986). The Court cannot weigh the evidence or determine the truth of the disputed matter and must determine only whether there is a genuine issue for trial. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016). The moving party bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, this burden may be discharged if the moving party can show "there is an absence of evidence to support the nonmoving party's case." *Id.* Once this is shown, the

6

nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

### DISCUSSION

The City has now moved for summary judgment on all claims against it. *See* Doc. 43 (Motion for Summary Judgment against MGU); Doc. 45 (Motion for Summary Judgment against Benchmark). Plaintiffs opposed each. (Docs. 48, 49). The City subsequently filed two combined motions to strike and replies in support of summary judgment (Docs. 51, 52). The Court addresses each motion in turn.

Motion for Summary Judgment Against MGU (Doc. 43)

*Motion to Strike*

As an initial matter, the Court considers the City's Motion to Strike the Affidavit of George Coleman (Doc. 49-1). Coleman served as both an equal owner and Managing Member for MGU, as well as the Operations Manager for Benchmark. (Doc. 49-1, Coleman Affidavit, at 1). In his Affidavit, Coleman states that, "[g]iven [his] experience and work role in each company, all parties routinely referred to the companies and personnel interchangeably." *Id.* Coleman also clarified "[i]n [his] deposition answer that MG Underground was not owed money, [he] assumed the question related to the moment in time of the deposition, and not reflecting if the litigation is successful or when Lima pays retained funds still owing." *Id.* Finally, Coleman asserts "[t]he City of Lima is unjustly enriched by keeping MG Underground's labor and material having refused to pay Benchmark and then to MG Underground for the actual work, including uncompensated change orders and directives, and non-conforming plans and specification for which Lima is liable." *Id.* at 1-2.

7

The City seeks to strike this Affidavit on the grounds it is "contradictory to [Coleman's] deposition testimony and otherwise offers nothing more than inadmissible legal conclusions." (Doc. 51, at 1). "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir. 2000) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). Additionally, courts are not to consider conclusions of law found in affidavits. *Johnson v. Donahoe*, 642 F. App'x 599, 602 (6th Cir. 2016).

In his first deposition, Coleman testified MGU did not have a written contract with Lima, only with Benchmark. (Doc. 44-5, at 16-17). Coleman did not speak with anyone from Lima other than through the bid document he submitted on behalf of Benchmark. *Id.* at 24. The bid document does not list MGU, or any party, as a subcontractor. (Doc. 44-6, at 93). Coleman further stated that after a bid was submitted but before the contract was awarded, there were no interactions between MGU and Lima. *Id.* at 35. The contract between MGU and Benchmark was not executed until after Benchmark was awarded the project. *Id.* at 40. Coleman indicated MGU worked on the project with the understanding it was working under the subcontract. *Id.* at 41. In his second deposition, Coleman testified he submitted project schedules to the project engineer on behalf of Benchmark. (Doc. 44-7, at 52-53). Coleman's deposition testimonies demonstrate he understood MGU was a subcontractor to Benchmark. This directly contradicts his assertion that the parties referred to the two companies interchangeably. Because of this, this portion of his Affidavit must be stricken. *Hughes*, 215 F.3d at 549.

Coleman also testified there was no payment that MGU believed was due from Benchmark. (Doc. 44-7, at 73). Coleman further indicated there was no amount due between MGU and Benchmark outside of retentions yet to be paid by Defendant. *Id.* Coleman was further

unaware of any Benchmark subcontractors that remain unpaid. *Id.* at 138. MGU argues this line of questioning was "over-generalized" and that "[Defendant] did not ask whether Benchmark would owe [MGU] funds if conditions change such that Benchmark recovered funds from [Defendant]." (Doc. 53, at 2). As stated, Coleman clarified in his Affidavit that his answer did not reflect "if the litigation is successful or when [Defendant] pays retained funds still owing." (Doc. 49-1, at 1). If there is no direct contradiction, a district court should not strike an affidavit unless the affidavit "attempts to create a sham fact issue." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). The existence of a sham fact issue can turn on several factors, such as "whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.* This Court finds Coleman's Affidavit merely explained the confusion and incompleteness of his previous testimony and does not raise a "sham fact" for these purposes. As such, Defendant's motion to strike this portion of the Affidavit is denied.

Finally, Coleman asserts Lima was unjustly enriched. (Doc. 49-1, Coleman Affidavit, at 1). Because MGU brings a claim for unjust enrichment (Doc. 1, at 6), this portion of the Affidavit goes to an ultimate issue in this case, making it a legal conclusion. Because this Court cannot consider conclusions of law found in an affidavit, *Donahoe*, 642 F. App'x at 602, this portion of the Affidavit must be stricken. Defendant's motion is granted as to Coleman's statements regarding unjust enrichment.

In summary, ¶¶ 4 and 6 of Coleman's Affidavit are contradictory and offer impermissible legal conclusions. Therefore, these statements are stricken.

Benchmark MG Exhibit C, Page 9 of 26

*Breach of Contract*

MGU brings a claim for breach of contract. (Doc. 1, at 6). The City argues MGU is not a third-party beneficiary of the contract between it and Benchmark. (Doc. 43, at 7).

Under Ohio law, "only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract." *3LI Consultant Grp. v. Cath. Health Partners*, 2017 WL 3597422, at *1 (6th Cir.) (quoting *Grant Thorton v. Windsor House, Inc.*, 57 Ohio St. 3d 158, 161 (1991)). A party will only be considered an intended third-party beneficiary if the language of the contract indicates as such. *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 856 (6th Cir. 2020) (citing *Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d 196 (2011) (holding that "[i]n applying the intent-to-benefit test, the court should look first to the parties' expression of intent 'in the language of the agreement.'")). Generally, "absent an agreement otherwise, there is no privity of contract between a property owner and subcontractor." *E.S. Wagner Co. v. Plant Process Equip. Inc.*, 2021 WL 1214821, at *2 (N.D. Ohio) (quoting *G.R. Osterland Co. v. Cleveland*, 748 N.E.2d 576, 578 (Ohio Ct. App. 2000)). "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *CSX Transp., Inc. v. Columbus Downtown Dev. Corp.*, 307 F. Supp. 3d 719, 738 (S.D. Ohio 2018) (quoting *Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d 196, 200 (2011)).

MGU cannot credibly contend it was an intended third-party beneficiary based solely upon the language of the contract. The contract explicitly states:

O. Nothing in the Contract Documents:

    1. shall create for the benefit of any such Subcontractor, Supplier, or other individual or entity any contractual relationship between Owner or Engineer and any such Subcontractor, Supplier, or other individual entity; nor

10

> 2. shall create any obligation on the part of Owner or Engineer to pay or to see to the payment of any money due any such subcontractor, Supplier, or other individual or entity except as may otherwise be required by Laws and Regulations.

(Doc. 44-2, Exhibit 5, at 80). Additionally, MGU is never mentioned in the contract.

Despite this, MGU makes several arguments as to why it should be considered an intended third-party beneficiary. First, MGU points to the City's negligence counterclaim. (Doc. 49, at 2). In that counterclaim, the City claims "Benchmark and [MGU] failed to perform their work on the Project in a workmanlike manner and were otherwise negligent in the performance of their work." (Doc. 18, at 12). MGU argues this counterclaim admits MGU "owed a duty of care to the City of Lima" and "[w]ithout privity of contract, the only basis [for this claim] is as a third-party beneficiary." (Doc. 49, at 2). However, when underlying duties are created by a contract to which a project owner is not a party, no tort action lies in the project owner's favor. *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St. 3d 412, 415 (2005). A project owner may not recover in tort when a subcontractor has no duty in tort to protect a project owner from purely economic damages. *Id.* Because the City's negligence counterclaim is invalid as a matter of law, it cannot operate as an admission by the City regarding the duty of care owed between itself and MGU.

MGU also argues "[the City of Lima] routinely used the Benchmark and [MGU] appellations interchangeably." (Doc. 49, at 2). Specifically, MGU points to letters from Defendant that are addressed to "Benchmark, Attention: Drew Yandell, Construction Superintendent." *Id.*; *see also* Doc. 49-1, Exhibit B, at 1, 5. MGU also refers to the February 19, 2020 Meeting Minutes that includes "Benchmark/MG- Contractor" as attendees. *Id.*; Doc. 49-1, Ex. B, at 8.

However, as stated, the Court will only consider extrinsic evidence when the language of the contract is unclear or ambiguous. *CSX Transp.*, 307 F. Supp. 3d at 738. Because the language of the contract clearly indicates a benefit to Benchmark, MGU cannot use this evidence to genuinely dispute it was an intended third-party beneficiary.

Finally, MGU claims Lima "amended its own prime contract language denying third party beneficiary status through its own actions, ignoring contract privity" in order to confer a benefit to MGU. (Doc. 49, at 3). Additionally, MGU cites to *Valentine Concrete, Inc. v. Ohio Dep't of Adm. Serv.*, 62 Ohio Misc. 2d 591, 601 (Ct. Cl. 1991) to suggest Lima's verbal orders contrary to the project contract constituted a "constructive change order" allowing for recovery of additional costs. (Doc. 49, at 3).

However, the language of the contract explicitly covers these terms. According to the contract:

> Unless expressly agreed to elsewhere in the Contract, no assignment by a party hereto of any rights under or interests in the Contract will be binding on another party hereto without the written consent of the party sought to be bound; and specifically, but without limitation, money that may become due and money that is due may not be assigned without such consent (except to the extent that the effect of this restriction may be limited by law); and unless specifically stated to the contrary in any written consent to an assignment, no assignment will release or discharge the assignor from any duty or responsibility under the Contract Documents.

(Doc. 44-2, Ex. 5, at 40). In another section of the contract, the parties agreed the contract "may be amended or supplemented by a Change Order, a Work Change Directive, or a Field Order." (Doc. 44-2, Ex. 5, at 92). If there were to be a change to the contract price or time, it must have been agreed to in writing by the contractor and the City. *Id.* As argued by the City (Doc. 51, at 8), no such written consent was given for any assignment nor were there any change orders

Benchmark MG Exhibit C, Page 12 of 26

giving a benefit to MGU. MGU cannot genuinely dispute that any change order was intended for their benefit.

For the reasons stated above, summary judgment is granted to the City on MGU's claim for breach of contract against it.

*Unjust Enrichment*

MGU also brings a claim, in the alternative, for unjust enrichment. (Doc. 1, at 6). To bring a successful unjust enrichment claim, MGU must show: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 858 (6th Cir. 2020) (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179 (1984)) (quoting *Hummel v. Hummel*, 133 Ohio St. 520 (1938)).

However, under Ohio law, a municipality is not liable for unjust enrichment or quasi- and implied contracts. *Magnum Towing & Recovery, LLC v. City of Toledo*, 430 F. Supp. 2d 689, 701 (N.D. Ohio 2006); *see also Brainard v. City Toledo*, 118 Ohio Misc. 2d 158, 165-66 (Lucas Cty. Ct. of Common Pleas 2001) ("[i]t is established state precedent that a municipal corporation cannot generally be held liable for quasi- or implied contracts or for claims based upon the theory of quantum meruit.").

Therefore, even when viewing the facts in a light most favorable to MGU, MGU cannot establish that the City was unjustly enriched. Summary judgment is granted as to this claim.

Benchmark MG Exhibit C, Page 13 of 26

*Statutory Pre-Judgment Interest*

Finally, MGU asserts it is entitled to statutory pre-judgment interest. (Doc. 1, at 7). It is well settled that a party is entitled to prejudgment interest under Ohio Revised Code. § 1343.03(A) when damages are awarded in a breach of contract case. *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 741 (6th Cir. 2016). However, because the Court grants summary judgment in favor of the City on MGU's breach of contract claim, MGU cannot be entitled to pre-judgment interest.

For the foregoing reasons, the City's motion for summary judgment (Doc. 43) is granted on all of MGU's claims.

Motion for Summary Judgment against Benchmark (Doc. 45)

The City has also filed a Motion for Summary Judgment against Plaintiff Benchmark. (Doc. 45). The City argues it is entitled to summary judgment on Benchmark's claims because Benchmark materially breached the contract. *Id.* at 15. Benchmark filed an opposition (Doc. 48), to which the City filed a combined reply and motion to strike the Affidavit of Coleman attached to Benchmark's opposition. (Doc. 52). Benchmark has not offered a response to this motion.

*Motion to Strike*

In Coleman's second Affidavit, Coleman asserts:

3.  Through its Subcontract, [MGU] performed all material work agreed to by Benchmark in its prime contract with Lima.

4.  A condition precedent to the use of SPR is that the sewer is aligned in a straight line, as drawn by the City of Lima's design professionals. SPR cannot 'snake through' a variable, curvilinear sewer.

5.  In fact, the City of Lima's sewer was both vertically and horizontally misaligned, and included differing diameters of existing pipe. The City of Lima's plans were wrong. This prevented the proper installation of the SPR product, blocking it through every turn.

14

6.      To address the non-linear actual condition of the sewer, we requested of the City of Lima to allow us to substitute materials for one of the other products which the City of Lima included in its specification. But [Defendant] refused substitution.

7.      We attempted to address the changing directions of the sewer by digging additional pits to access the sewer at additional points. The City of Lima issued a change order to allow our adding pits, but refused to pay our costs of performing additional work.

8.      Also obstructing the proper installation of SPR was significant debris in the sewer, not disclosed by the City of Lima's bid specification. When we requested a change order for the actual cost of moving the debris, the City of Lima only agreed to pay approximately half of the actual cost, and then refused to pay even that amount. Accordingly, we removed the debris at our own cost.

9.      After the City of Lima repeatedly delayed the project schedule, we requested additional time to order additional material to replace defective product. The City of Lima refused, requiring us to install defective material rather than wait. This resulted in breached welds and grout leaking into the system, which had to be repaired at our cost.

10.     As the City of Lima originally bid the project to Plaintiffs, it is impossible to construct. As of this date, the City of Lima has not restarted the project, requiring full redesign.

(Doc. 48-1, at ¶¶ 3-10).

The City seeks to strike this Affidavit on the grounds that it "offers nothing more than unqualified and inadmissible opinions and legal conclusions, and portions contradict Coleman's prior deposition testimony." (Doc. 52, at 1).

As stated previously, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Hughes*, 215 F.3d at 549.

After review of Coleman's testimonies, several contradictions are apparent. First, Coleman's Affidavit asserts MGU and Benchmark performed all material work pursuant to the prime contract and subcontract. (Doc. 48-1, at ¶ 3). However, Coleman testified Benchmark

15

demobilized from the site on March 6, 2020 and did not perform any additional work. (Doc. 44-7, at 108). This section of Coleman's Affidavit is contradictory to his testimony.

Coleman's Affidavit also asserts that because Defendant's plans were wrong, proper installation of the SPR product was prevented "through every turn." (Doc. 48-1, at ¶ 5). Coleman testified, however, that the SPR product was installed at several different intersections in the project. (Doc. 44-7, at 23-24). It cannot be said that installation was prevented "through every turn." This statement is also contradictory to Coleman's testimony.

Finally, the City argues ¶ 9 of Coleman's Affidavit is contradictory. (Doc. 52, at 6-7). In that paragraph, Coleman said the City required the workers to install a defective product. (Doc. 48-1, at ¶ 9). In his deposition, Coleman testified the direction from the site engineer was that the City "did not want to wait on new material, [Defendant] could not wait on new material, [and] to use what we had available to us." (Doc. 44-7, at 141). The City argues this shows it never required the workers to install a defective product, making Coleman's Affidavit contradictory. (Doc. 52, at 7). However, the question asked immediately prior to this statement shows Coleman is not contradicting his testimony

> Q. You had indicated also that you had been informed to use whatever product was there, **even if defective**. Is that – I understand that earlier in your deposition testimony is that correct?
> A. Correct.

(Doc. 44-7, at 140) (emphasis added). Thus, ¶ 9 of Coleman's Affidavit is not contradictory to his testimony.

The City also argues several of the statements made in Coleman's Affidavit are "unqualified and inadmissible opinions and conclusions of law and fact." (Doc. 52, at 7). To start, Defendant states ¶¶ 4, 9, and 10 "which, pursuant to [Fed. R. Evid. 702], require demonstrated expertise for their admissibility." *Id.* Under Federal Evidence Rule 702:

16

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party offering expert testimony must meet the burden of showing "by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Cook v. Erie Ins. Co.*, 478 F. Supp. 3d 658, 663 (S.D. Ohio 2020) (quoting *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)). As stated previously, courts are not to consider conclusions of law or fact found in affidavits. *Donahoe*, 642 F. App'x at 602.

The City argues ¶¶ 4, 9, and 10 "set forth opinions which, pursuant to Rule 702, require demonstrated expertise for their admissibility." (Doc. 52, at 7). As the City points out, Plaintiff has not identified Coleman to be an expert witness in this case. Coleman's Affidavit does not show by a preponderance of proof that Coleman is qualified to testify as an expert regarding these matters. *Cook*, 478 F. Supp. 3d at 663.

Finally, the City states ¶¶ 5, 7, 8, 9, and 10 of Coleman's Affidavit "involve conclusions of law and/or conclusions as to ultimate fact at issue." (Doc. 52, at 8). Upon review, the Court agrees. These paragraphs must be stricken from the Affidavit.

In conclusion, for the reasons stated herein, the Court grants the City's motion to strike ¶¶ 3-5 and 7-10 of Coleman's second Affidavit.

*Breach of Contract*

The City moves for summary judgment on Benchmark's breach of contract claim on the basis that the claim "[i]s invalid because Benchmark materially breached the contract[.]" (Doc.

45, at 15). The City alleges Benchmark has not completed the project (and did not complete the project by October 25, 2019, as contemplated by Change Order No. 3) and that Benchmark's work "was defective and not done in a workmanlike manner." *Id*. at 16. For the same reasons, the City asserts it is entitled to summary judgment on its breach of contract counterclaim against Benchmark.

Under Ohio law, a successful breach of contract claim must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Alshaibani v. Litton Loan Servicing, LP*, 528 F. App'x 462, 464 (6th Cir. 2013) (quoting *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (1994)). If performance of a term in the contract is considered essential to the agreement, then a breach of that term discharges the obligations of the non-breaching party. *Abercrombie & Fitch Co. v. Fed. Ins. Co.*, 2011 WL 1237611, at *7 (S.D. Ohio) (citing *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 163, 170 (1990)).

Benchmark first argues the *Spearin* doctrine should apply to this case. (Doc. 48, at 2). Under the doctrine, "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136 (1918). However, the *Spearin* doctrine does not overcome 'express and specific' contract provisions. *Thomas & Marker Const, Co. v. Wal-Mart Stores, Inc.*, 2008 WL 4279860, at *19 (S.D. Ohio) (quoting *Dugan & Meyers Constr. Co. v. Ohio Dep't of Adm. Servs.*, 113 Ohio St. 3d 226, 231 (2007)).

Additionally, a plaintiff will not be able to recover under the *Spearin* doctrine when: "(1) a reasonable inspection of the job site by the contractor would have revealed the actual site conditions, or (2) the information provided by the government was accurate, but the conclusions

18

drawn therefrom by the contractor differed from the actual site conditions." *Sherman R. Smoot Co. v. Ohio Dep't of Adm. Serv.*, 136 Ohio App. 3d 166, 177 (2000).

The City argues the contract provided specific procedures to address the site conditions at issue. (Doc. 52, at 11). The contract states it "may be amended or supplemented by a Change Order, a Work Change Directive, or a Field Order." (Doc. 44-2, Ex. 5, at 495). Any amendment or supplement to the contract involving a change in the contract price or terms must have been done through a change order. *Id.*

Further, both the bid documents and contract contain express language concerning site conditions. The bid form submitted by Benchmark indicated:

> B.      [Benchmark] has visited the Site, conducted a thorough, alert visual examination of the Site and adjacent areas, and became familiar with and satisfied itself as to the general, local, and Site conditions that may affect cost, progress, and performance of the work.
>
> …
>
> D.      [Benchmark] has carefully studied all: (1) reports of explorations and tests of subsurface conditions at or adjacent to the Site and all drawings of physical conditions relating to existing surface or subsurface structures at the Site that have been identified in the Supplementary Conditions, especially with respect to Technical Data in such reports and drawings…

(Doc. 44-6, Ex. 12, at 1267). Benchmark made the same representations in the Project contract. *See* Doc. 44-2, Ex. 5, at 440. Because Benchmark agreed to these express provisions, the *Spearin* doctrine is not applicable. *Thomas & Marker Const.,* 2008 WL 4279860, at *19. Thus, the express terms provided in the contract govern.

Benchmark further argues the City had a "duty to provide an adequate building site free of defects." (Doc. 48, at 3) (citing *Valentine Concrete, Inc. v. Ohio Dep't of Adm. Serv.*, 62 Ohio Misc. 2d 591, 617 (Ct. Cl. 1991)). Additionally, Benchmark claims because the project site was underground, "any site defects are latent, and not discoverable by a bidder until after contract award and subsequent excavation." *Id.*

19

A latent defect is a defect that is not readily observable or discoverable through a reasonable inspection. *Layman v. Binns*, 35 Ohio St. 3d 176, 178 (1988). Coleman testified he was the only person to inspect the site during the bid process. (Doc. 44-5, at 22-23). However, he did not go into the sewer line. *Id.* at 24. The site visit only entailed a surface and logistics evaluation. *Id.* Additionally, Coleman received project specifications from Defendant that included specific references to SPR and slip lining. *Id.* at 28-30. Ultimately, Coleman decided to place a bid with SPR. *Id.*

Despite conducting only a surface and logistics evaluation, Benchmark indicated it had inspected all conditions that could affect "cost, progress, and performance of the work." (Doc. 44-6, Ex. 12, at 1267). Benchmark was aware it was bidding on a sewer rehabilitation project and indicated in the contract it had observed the sewers (the "Site") despite not doing so. Although Benchmark seemingly asserts that the defect was latent because the "site" was below ground (Doc. 48, at 3), it cites no caselaw to support this proposition. Even when viewing the facts in a light most favorable to Benchmark, the Court cannot find a genuine issue of material fact regarding whether the subject matter of the contract was a latent defect.

Because Benchmark materially breached the contract, the City of Lima was discharged from its duties under the contract. *Abercrombie & Fitch Co.*, 2011 WL 1237611, at *7. As such, the City is entitled to judgment in its favor on Benchmark's breach of contract claim.

*Unjust Enrichment*

The City also seeks summary judgment as to Benchmark's unjust enrichment claim. (Doc. 45, at 17-18).

As stated previously, a municipality is not liable for unjust enrichment or quasi- and implied contracts. *Magnum Towing & Recovery*, 430 F. Supp. at 701; *Brainard*, 118 Ohio Misc.

2d at 165-66. As such, even when viewing the facts in a light most favorable to Benchmark, Benchmark cannot genuinely place this claim in dispute. Summary judgment is granted in favor of the City.

*Statutory Pre-Judgment Interest*

The City further seeks summary judgment on Benchmark's claim for statutory pre-judgment interest. (Doc. 45, at 18). As discussed above, a party is only entitled to pre-judgment interest under Ohio Revised Code § 1343.03(A) when damages are awarded in a breach of contract case. *Cranpark, Inc.*, 821 F.3d at 741. Because the Court grants summary judgment to the City on Benchmark's breach of contract claim, Benchmark is not entitled to pre-judgment interest. Summary judgment is granted to this claim.

## Counterclaims

The City also asserts it is entitled to summary judgment against Benchmark on its counterclaims for breach of contract, as well as implied warranty, express warranty, and negligence. At the outset, the City's Counterclaims are left entirely unrebutted as a result of Benchmark rooting its argument on the pleadings and plainly inadmissible legal conclusions contained in the Coleman Affidavit. Neither are properly relied on for purposes of summary judgment. Each Counterclaim cause of action is addressed in turn.

*Breach of Contract*

For the same reasons discussed above in relation to Benchmark's breach of contract claim, the Court finds the City is entitled to summary judgment on its breach of contract claim. That is, the lack of genuine issue of material fact about Benchmark's material breach of the contract prevents its recovery and also demonstrates the success of the City's breach of contract claim.

21

Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach. *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Benchmark must also "prove causation by a preponderance of the evidence in order to recover the claimed damages, especially lost profits, as a result of breach of contract or negligence." *Id.* at 466.

There is no dispute Benchmark and the City of Lima entered a contract. (Doc. 48, at 1). The evidence establishes the City upheld its obligation to perform under the contract until Benchmark materially breached by abandoning the Project. (Doc. 44-7, at 56); *Lewis v. McDonald's Corp.*, 1995 U.S. App. LEXIS 37083, *6-7 (6th Cir.) ("If a party breaches a contract by failing to comply with a duty imposed by the contract, . . . [and if] the breach is material, then the other party is excused from performing its duties under the contract[.]"). Lastly, damages are established by the City's expert, Smith, P.E., to the tune of $1,215,809. (Doc. 46-1, at 7-8).

Because Benchmark has offered no evidence in opposition, and for the same reasons stated in relation to Benchmark's breach of contract claim, the City of Lima has carried its burden and is entitled to summary judgment in its favor on the Counterclaim for breach of contract.

*Express Warranty*

Under Ohio law, "[t]he duty to perform in a workmanlike manner is imposed by common law upon builders and contractors." *Cook v. ProBuild Holdings, Inc.*, 17 N.E.3d 1210, 1215 (Ohio Ct. App. 2014) (citing *Zanesville Glass Supply, Inc. v. Goff*, 2008 WL 732646, ¶ 40 (Ohio Ct. App.)). This common law duty arises under tort where a construction project is completed

22

below the standard of care required. *Id.* at 1217. However, where the duty to perform in a workmanlike manner is included in the express language of a contract for future services, the duty arises out of contract if not performed. *Warren v. Denes Concrete, Inc.*, 2009-Ohio-2784, ¶ 16 (Ohio Ct. App.) ("[w]hen a contract contains an express warranty in which a contractor undertakes a duty to perform in a workmanlike manner, a claim against the contractor for an alleged breach of that duty sounds in contract."). For this reason, the City's claim for breach of express warranty duplicates the outcome of the breach of contract claim.

*Breach of Contract Damages*

Citing the report of its engineering expert, Smith, P.E., the City argues the cost to complete the Project amounts to $1,215,809. Benchmark criticizes this figure, arguing "the City of Lima merely asserts its counterclaim in the amount to use it as a setoff for Plaintiff contractors' claims otherwise." (Doc. 48, at 8). This type of argument is ineffectual without providing Rule 56 evidence to support it. Further, Benchmark's reliance on *ABLE Roofing v. Pingue*, is misguided, and actually works in support of the City's position as the non-breaching party. 2011-Ohio-2868, ¶ 22 (Ohio Ct. App. 2011) ("a party proving breach of contract is entitled to the benefit of his or her bargain") (internal citations omitted). Benchmark is not entitled to the "benefit of the bargain" as the breaching party. *Lewis*, 1995 U.S. App. LEXIS 37083 at *6-7. Instead – the City is entitled to money damages designed to "compensate the non-breaching party for the losses suffered as a result of a breach." *Quest Workforce Sols., LLC v. Job1USA, Inc.*, 119 N.E.3d 817, 822 (Ohio Ct. App. 2018) (citing *DeCastro v. Wellston City Sch. Dist. Bd. of Edn.*, 761 N.E.2d 612 (Ohio 2002)). However, the Sixth Circuit has recognized that "a plaintiff should be made whole for his injuries, but should not receive a windfall." *In re Foote Mem'l Hosp./Patient Care Info. Sys.*, 25 F.3d 406, 410 (6th Cir. 1994). "In making a party

23

injured by wrongful conduct whole, the damages awarded should not place the injured party in a better position than that party would have enjoyed had the wrongful conduct not occurred." *MCI Worldcom Network Servs., Inc. v. W.M. Brode Co.*, 413 F. Supp. 2d 868, 871 (N.D. Ohio 2005) (citing *Collini v. Cincinnati*, 622 N.E.2d 724 (Ohio 1993)).

Here, the City has met its burden insofar as establishing the $73,600 in repairs and $1,215,809 it will cost the City to complete the project, amounting to a combined total of $1,289,409. (Doc. 46-1, at 7-8). Benchmark has not offered evidence disputing these amounts, and therefore, there is no genuine dispute of material fact. Further, there is no disagreement that the original bid price was $3,250,828.00. (Doc. 45, at 4). However, subsequent to the bid, the City and Benchmark agreed to a number of price increases for additional work such as sediment cleaning and additional SPR. (Doc. 45, at 14). Thus, the City has satisfied its burden of proof in demonstrating it is entitled to compensatory damages in the full amount of costs to repair and complete the project in excess of the contract price. In order to determine proper compensatory damages, the $1,289,409 to repair and complete the project will be added to the City's expenditures on the project to date; Benchmark is liable in the form of compensatory damages for any costs exceeding the final agreed upon contract price. However, because neither party has provided Rule 56 evidence in its briefing to determine with relative accuracy the amount the City has expended on the project, or made clear all of the upward variations agreed upon for additional work, a genuine dispute of material fact remains on this limited issue of compensatory damages.

*Common Law Counterclaims*

The City also brings common law tort claims for breach of implied duty and negligence. The City alleges Benchmark breached its common law duties by failing to properly construct the

24

SPR in a workmanlike manner. (Doc. 45, at 18-19). The City's expert, Frederic J. Smith, concludes that the cost of repairing the "faulty aspects" of SPR laid by Benchmark amounts to $73,600. (Doc. 46-1, at 7). Benchmark produces no evidence refuting the defective nature of the installed SPR or the amount to repair it. However, the City's tort claims fail as a matter of law because actions of this kind are barred under Ohio's economic loss rule. "The economic-loss rule generally prevents recovery in tort of damages for purely economic losses. The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Ashtabula River Corp. Grp. II v. Conrail*, Inc., 549 F. Supp. 2d 981, 987 (N.D. Ohio 2008) (citing *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Company*, 537 N.E.2d 624 (Ohio 1989)) (internal citations omitted). "The reason for denying recovery in negligence for purely economic loss lies not in a failure to find 'negligent' conduct by the manufacturer . . . Rather, the key factor is the . . . source, of the duty owed by the manufacturer to the consumer." *Chemtrol Adhesives, Inc*, 537 N.E.2d 624, 630 (1989).

In *Chemtrol*, the Ohio Supreme Court recognized that buyers may recover under a theory of negligence where there is "any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity." *Id.* Conversely, "where there is no accident . . . and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, . . . [plaintiff's] purely economic interests are not entitled to protection against mere negligence." *Id.* The *Chemtrol* court concluded the economic-loss rule prevented recovery for the cost of repair to damage to the defective property itself. *Id.* at 631.

Benchmark MG Exhibit C, Page 25 of 26

Because the City is seeking damages for merely the cost of repairs to the defective property itself, and because no other physical harm to person or property is alleged, the proper avenue for recovery is limited to contract law. Therefore, the City's motion for summary judgment on negligence and implied warranty are denied.

### CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that the City of Lima's Motions for Summary Judgment on Benchmark's and MG Underground, LLC's claims (Docs. 43, 45) be, and the same hereby are, GRANTED; and it is

FURTHER ORDERED that the City of Lima's Motion for Summary Judgment on its Counterclaim for breach of contract against Benchmark (Doc. 45) be, and the same hereby is, GRANTED IN PART as to liability, and DENIED IN PART as to damages; and it is

FURTHER ORDERED that the City of Lima's Motion for Summary Judgment on all other Counterclaims (Doc. 45) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that the City of Lima's Motions to Strike (Docs. 51, 52) be, and the same hereby are, GRANTED IN PART and DENIED IN PART as set forth above.


   s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

26